UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **LARRY KOENIG & ASSOC., LLC** | **01-12829** |
| DEBTOR | |
| **MARTIN A. SCHOTT, TRUSTEE FOR** | ADV. NO. |
| **LARRY KOENIG & ASSOC., LLC AND** | |
| **LARRY AND NYDIA KOENIG** | **03-1063** |
| PLAINTIFF | |
| V. | |
| **ANDREA LYNN McLEAR,** | |
| **LARRY KOENIG & ASSOC., LLC AND** | |
| **LARRY AND NYDIA KOENIG** | |
| DEFENDANTS | |

## MEMORANDUM OPINION

The trustee sued Andrea McLear, Larry Koenig and Associates, L.L.C. ("LKA") and Larry and Nydia Koenig (collectively the "Koenigs")[1] to establish ownership of, or to recover, several assets. LKA is the family business through which Lawrence John Koenig carried on his business of presenting parenting seminars across the United States. LKA filed chapter 7 on November 5, 2001.

### TRUSTEE'S CLAIMS

**I.    Count One – Claims relating to Smart Discipline**

The Trustee asks the Court to set aside the August 11, 2000 transfer of the

---

[1] Larry and Nydia Koenig are themselves debtors in this Court. Their chapter 7 petition was filed November 5, 2001 and assigned case no. 01-12828.

service mark[2] *Smart Discipline* to McLear. The complaint alleges that either the Koenigs or LKA transferred the mark to McLear for little or no consideration and to the prejudice of rights of existing creditors while the defendants were insolvent, or that the transfer increased their insolvency. The trustee asks for avoidance of the transfer pursuant to Louisiana Civil Code article 2036. In the alternative, the trustee alleges that the transfer was a simulation. In final alternative, the trustee contends that the transfer was a donation that is null because the documents effecting the transfer did not comply with formalities established by the Louisiana Civil Code for transfers of incorporeal movable property.

(A) Revocatory Action

The trustee makes his claims under Louisiana Civil Code article 2036,[3] pursuant to 11 U.S.C. §544 (b)(1). To prevail, the trustee must prove that LKA's transfer to McLear caused or increased LKA's insolvency (that is, the amount by which LKA's liabilities exceeded the total of its "fairly appraised assets.") La. Civil Code art. 2037. The trustee did not offer any expert testimony to support his contention that the debtor was insolvent when it transferred the service mark *Smart Discipline* to McLear nearly fifteen months before LKA filed its bankruptcy petition. His case rests principally on the testimony of McLear and the bankruptcy case record.

---

[2] The U.S. Patent and Trademark Office registration for *Smart Discipline* denotes the "Type of Mark" as a service mark. See Exhibit T-4. The parties repeatedly referred to the name as a trade name at trial and in their pleadings. However, trade names and trademarks or service marks are distinct *Accuride Inter., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989). Trade names symbolize a company's business reputation. *Id*. Trademarks and service marks identify and distinguish a company's goods (trademarks) and services (service marks). *Id*. Only trademarks and service marks may be registered with the Patent and Trademark Office. *Id*.

[3] Louisiana Civil Code article 2036 provides in relevant part: "An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency . . . ."

2

Andrea McLear is Larry Koenig's stepdaughter. She worked for LKA for ten years, and at one time was LKA's office manager. Her duties included managing office staff, arranging programs and making travel plans for Dr. Larry Koenig. She also oversaw bookkeeping, bill payment and the company's accounts receivable.

Ms. McLear testified that in August 2000, at about the time of the transfer of the mark to her, LKA's assets comprised an estimated $30,000 in bank accounts,[4] between $20,000 and $40,000 in accounts receivable, $50,000 in inventory (comprising books and other materials) at cost, and computers and equipment for which she did not give a value. She believed that LKA's combined debt in August 2000 was between $80,000 and $100,000. Accordingly, LKA's net assets totaled approximately $20,000 to $40,000 at the time of the transaction at issue.

To demonstrate the debtor's insolvency in August 2000, the trustee offered evidence of the debtor's assets and debts at the time of bankruptcy which was nearly fifteen months after the transfer. Even if the information in LKA's schedules did prove the debtor's insolvency at bankruptcy,[5] LKA's insolvency at the date of filing does not prove that it was insolvent at the time of the transfer more than a year earlier.

Finally, the trustee offered absolutely no proof supporting a claim against either Larry or Nydia Koenig under article 2036. Accordingly, the Court will dismiss the portion of count one of the complaint against the Koenigs individually.

---

[4] McLear on cross examination admitted that she guessed at the exact account balance on that date, but recalled that it tended to remain about the balance to which she testified.

[5] The trustee introduced proofs of claim filed against LKA to attempt to establish that the debtor was insolvent in August 2000. However, the amount owed to most of those creditors in August 2000 cannot be divined from the information accompanying the proofs of claim. Specifically, a review of the claims filed in the case, including the "date incurred" entries on claim forms, shows that, in many cases, the dates listed corresponded with the commencement of the relationship between the LKA debtor and the creditor, and not the date on which the final prepetition balance was incurred.

  (B) <u>Absolute Simulation</u>

  In the alternative, the trustee argues that LKA's transfer of the service mark *Smart Discipline* was a simulation. The trustee has the burden of proving the simulation by reasonable certainty. *Bogani v. Waterbury*, 403 So.2d 856, 858 (La. App. 3d Cir. 1981) (citation omitted).

  Under Louisiana law, a simulation is a contract that by mutual consent, does not express the true intent of the parties. La. Civ. Code art. 2025; *Matter of Zedda*, 103 F.3d 1195, 1204 (5th Cir. 1997); *Succession of Terral*, 312 So.2d 296, 299 (La. 1975) (simulated contract has no existence in fact, and may be declared a sham) (citations omitted). An absolute simulation has no effect between the parties because they intend that their contract produce no effects between them. La. Civ. Code art. 2026. The specific facts of a transaction must be examined to determine whether the transaction is a simulation, because "[e]ach case involving a claim of simulation must be decided on its peculiar facts." *Terral*, 312 So.2d at 300; *Matter of Ulrich*, 279 B.R. 187, 193 (Bankr. E.D. La. 1987). Moreover, a simulation often must be proven by indirect or circumstantial evidence, *Wilson v. Progressive State Bank & Trust Co.*, 446 So.2d 867, 868 (La. App. 2d Cir. 1984), and involves "a determination of whether the instrument under scrutiny is something other than what meets the eye." *Zedda,* 103 F.3d at 1205.

  Andrea McLear testified that she handed Larry Koenig the $1.00 purchase price for the name, and was given a receipt for her payment. Exhibit D-8. Koenig confirmed these events, and also acknowledged preparing both the bill of sale (Exhibit T-1) and the receipt, which were executed August 11, 2000. Koenig testified that McLear was the only one of his five children who had spent a significant amount of time

4

working in the family business. Koenig testified that he expected McLear to continue to work for him, or else would not have transferred the mark to her. No party offered evidence of McLear's agreement to reconvey the service mark under any circumstances, and the trustee produced no direct evidence that LKA and McLear did not intend their agreement to actually transfer the trade name to McLear. Finally, no evidence suggested that LKA transferred the mark to protect it from the demands of creditors, or that some event or the threat of an event such as an impending seizure or other action by creditors precipitated the need to transfer the asset for any purpose other than those to which McLear and Larry Koenig testified. *Compare Agricultural Supply Co. v. Lavigne*, 179 La. 1030, 155 So. 764, 765 (La. 1934) (presumption of simulation strengthened where insolvent debtor being sued sold property to close relatives).

Accordingly, the Court concludes that LKA's transfer of the service mark *Smart Discipline* to McLear was not an absolute simulation.

(C) Relative Simulation or Disguised Donation

The trustee next argues that, if the transaction was not a simulation, it instead is a disguised donation, and can be set aside because it did not comply with the Louisiana Civil Code's requirements for donation of incorporeal movables. La. Civ. Code art. 1536. The defendants respond that the transaction was a sale, and not a donation, and therefore was not subject to the formalities prescribed by article 1536. They contend that the $1.00 value assigned to the mark was not unreasonably small, because the name had "Virtually no market value at the time of the transfer." Defendants' Pretrial Brief at 3; Defendants' Post-Trial Brief at 4.

5

A relative simulation is a transaction in which the parties intend that their agreement produce effects between them that differ from those recited in the contract. La. Civ. Code art. 2027. Disguised donations are relative simulations.[6] They are distinguished from simulations (or "sham transactions") by the fact that a relative simulation on its face appears to be a valid sale, although the parties intended that the transfer be a gift, rather than a sale. *Ridgedell v. Sucession of Kuyrkendall*, 740 So.2d 173, 179 (La. App. 1st Cir. 1999) (citations omitted). Thus, a transfer held to be a disguised donation is subject to Civil Code articles governing donations. *Owen v. Owen*, 336 So.2d 782, 786 (La. 1976).

The evidence supports the conclusion that LKA's transfer of the service mark to McLear was a disguised donation. Ms. McLear both paid the $1.00 purchase price and concluded the transaction at her twenty-fourth birthday celebration. Indeed, McLear testified that the opportunity to purchase the mark was her birthday present, and that she had not discussed the transaction with her parents before it took place. Additionally, the consideration for the transaction was nominal, given Larry Koenig's admission that his sales of materials using the *Smart Discipline* name have generated "substantial revenues" after LKA filed for bankruptcy, when he began doing business through Smart Discipline, L.L.C. Other circumstances surrounding the transaction support the conclusion that the transfer was a disguised donation. Applicable facts include the transfer to a relative of insiders of the LKA debtor, and the transferor's continued use of the mark after the transfer, albeit in exchange for payment of Andrea McLear's health insurance. Perhaps

---

[6] One author has described them as "disguised-transfer" simulations. *See* Lemann, *Some Aspects of Simulation in France and Louisiana*, 29 Tulane L. Rev. 22 (1954). Courts also have equated relative simulations and disguised donations. *See, e.g.*, *Allen v. Allen*, 539 So.2d 820, 824 (La. App. 3d Cir. 1989) and *Moore v. Moore*, 427 So.2d 1320, 1323 (La. App. 2d Cir. 1983).

6

the most telling is the fact that McLear had not discussed the transaction with her parents before her birthday – necessarily implying that it was not so much an arm's length agreement between her and her parents, as a gift masquerading as a sale.

The defendants apparently invite the Court to infer that McLear's uncompensated labor over the years should be taken into account as additional consideration for the transfer. However, this argument is undermined by McLear's admission at trial that she was paid fairly (first hourly and later on a salaried basis) when she rendered services to the family business. Larry Koenig also testified that his step-daughter was fairly paid for her work. Thus, defendants find no support in the evidence for their argument that LKA transferred the service mark in part in exchange for McLear's uncompensated work on behalf of the family business over the years.

A donation disguised as a sale may be valid if the form of the transaction complies with the Civil Code. La. Civ. Code art. 2027, comment (b). An act that is a disguised donation, or a relative simulation, actually transfers title to the vendee, if it complies with formalities prescribed by the Civil Code. *See Kuyrkendall*, 740 So.2d at 181. The validity of the act in fact depends on whether it complies with the formalities imposed by Louisiana law. La. Civ. Code art. 2027, comment (c). *Bonnett v. Mize,* 556 S.2d 228, 232 (La. App. 2d Cir. 1990), *writ denied,* 559 So.2d 1360 (La. 1990) (counter letter executed contemporaneously with simulated sale satisfied formal requirements of article 1536, and therefore was valid donation).

Because the August 11, 2000 Bill of Sale is a relative simulation, or a disguised donation of an incorporeal movable, Civil Code article 1536 required that it be passed before a notary public and two witnesses, under penalty of nullity. The Bill of Sale does

7

not comply with the formalities required by article 1536, and therefore is not a valid donation. La. Civ. Code art. 2027, comments (b) and (c).

This aside, the trustee has superior rights to the service mark because it has remained registered to the debtor at all times. Registration of a trademark or service mark creates a presumption of the registrant's ownership of the mark. *Brittingham v. Jenkins*, 914 F.2d 447, 452 (4th Cir. 1990). There was no evidence that the registration for the service mark *Smart Discipline* was ever changed from LKA to McLear. Larry Koenig even admitted that McLear never accomplished this change despite his repeated requests that she do so. Consequently, as of November 5, 2001, the date LKA filed its bankruptcy petition, LKA was the presumptive owner of the service mark. Under 11 U.S.C. §541, the service mark was property of LKA's estate. Thus, under 11 U.S.C. §544(a), the trustee had the power to avoid the purported transfer to McLear.

**II.    Count Two – Claims relating to smartdiscipline.com**

The trustee also seeks a declaratory judgment that the domain name *smartdiscipline.com* is property of the LKA bankruptcy estate. The basis for the remedy is not made plain in the complaint, but apparently is that the name originally was registered as belonging to LKA, but that on August 6, 2002 – after bankruptcy – it was re-registered to McLear.

(A)    Facts Regarding the Domain Name

Although neither the service mark *Smart Discipline* nor the domain name were listed as assets on LKA's or the Koenig's schedules, the trustee established that *Smart Discipline* was registered to LKA by the United States Patent and Trademark Office on July 31, 2001. Exhibit V-35. McLear testified at trial that although the domain name was

8

*registered* to LKS, it was always *owned* by her.  However, McLear never filed anything with the Patent and Trademark Office to change the registration, and testified that to her knowledge, the mark was still registered to LKA as of the date of trial.  Larry Koenig admitted on examination by the trustee that the service mark *Smart Discipline*, for which LKA filed in May 2000, was still registered to LKA in July 2002 when the bankruptcy was filed (*see* Exhibit T-4, Patent & Trademark Office search dated July 23, 2002), and even at the time of trial in November 2003.  He specifically instructed McLear more than once to file to change the registration to her name.

The trustee also proved through Ms. McLear's testimony that the domain name *smartdiscipline.com* originally was registered to LKA.  As recently as July 24, 2002 (nearly ten months post-petition), the domain name still was registered to LKA.  Exhibit T-6.  McLear identified Exhibit T-7, registration information for *smartdiscipline.com*, showing that registration for the site had been changed to reflect her as the account contact as of September 5, 2002.  She testified that she caused Explorer Interactive to make the change in the account, but the evidence of the September 2002 registration change cannot be reconciled with the fact that she claimed to have caused the change to be made only after her December 2002 deposition in connection with this case.  In any case, there is no dispute that McLear caused the change in registration well after LKA's bankruptcy was filed.  And even though McLear stated at trial that the website "belonged" to her, she admitted that there are no documents showing that LKA gave her the right to use the domain name *smartdiscipline.com*, or that she authorized LKA to use the domain name.  Also, no documentary evidence was introduced to corroborate McLear's allegations that the domain name was registered to her before July 24, 2002.

9

From the inception of the website in 1998, through bankruptcy in 2001, LKA paid the cost of creating the smartdiscipline.com website, the cost of maintaining the website and the cost of annually renewing the domain name. Although McLear testified that she unsuccessfully sought to sell another publisher's books through the website,[7] the site was devoted primarily to the sale of LKA's products.

The evidence supports the conclusion that Ms. McLear only operated, but never owned, the website for LKA to which the domain name *smartdiscipline.com* was registered. McLear testified that she continues to operate the website for *smartdiscipline.com*, although now she works for Smart Discipline, L.L.C., the entity through which Larry Koenig now conducts his business. Exhibit T-9 in fact shows Larry Koenig & Associates at the website, but the name *Smart Discipline, L.L.C.* appears at the bottom of the screen.

The defendants argue that *smartdiscipline.com* never belonged to LKA, although they concede that it was registered to LKA "for a time." They argue that LKA's conveyance of the service mark *Smart Discipline* to McLear conferred the ownership of the domain name on her as owner of the mark. They rely on provisions of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125 *et seq.* Defendants' Post-Trial Brief at 4-5. Their reliance is misplaced. Section 1125(d)(1)(A) of the ACPA provides that certain acts of "cyberpiracy" involving domain names can cause the actor to be liable to the owner of a trademark or service mark for damages.[8]

---

[7] LKA advanced the cost of the books on the expectation that it would be paid from sale proceeds. The effort apparently was not successful in producing profits.

[8] 15 U.S.C. §1125(d)(1)(A):
    A person shall be liable in a civil action by the owner of a mark, . . . if, without regard
    to the goods or services of the parties, that person
        (i)    has a bad faith intent to profit from that mark . . .; and

However, the ACPA does not specifically provide that the owner of a trademark or service mark is necessarily the owner of an associated domain name. In fact, the statute was enacted to prevent the "cybersquatting" of a domain name by an individual who may register the domain name, but is not the owner of the related mark.[9]

No independent evidence corroborated McLear's contention that she ever personally owned the domain name *smartdiscipline.com* or any right to use the domain name.

(B) Domain Name as Property

A domain name is an internet address for a site on the World Wide Web, a global network of computers that provide information services. *See* Freeman, *Internet Domain Name Security Issues: Why Debtors Can Grant Then and Lenders Can Take Them in This New Type of Hybrid Property*, 10 Am. Bankr. Inst. L. Rev. 853, 855 n.13 (Winter 2002). The right to use a domain name can have significant value, in much the same way that a unique telephone number can for a business. *Id*. at 857.

The trustee cites no legal authority for the proposition that a domain name is property. Defendants argue that a domain name is not property, and therefore that *smartdiscipline.com* cannot be property of LKA's bankruptcy estate. Defendants' Amended Post-Trial Brief at 5. However, defendants point to no authority for their

---

(ii) registers, traffics in, or uses a domain name that ---
   (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
   \* \* \* \*
   (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

[9] The ACPA was passed in part to "'provide clarity in the law for trademark owners by prohibiting the bad faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks – a practice commonly referred to as 'cybersquatting'.'" *Sporty's Farm, L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 495 (2d Cir. 2000), citing S. Rep. No. 106-140 at 4.

11

position that a domain name is *not* property. They content themselves and exhaust their creativity in sniping at authorities cited by the intervenor, Visual Fulfillment Services, Inc. ("VFS"). In any event defendants also argue that the trustee did not prove that LKA ever owned the domain name because the documents evidencing its registration do not prove that LKA actually owned the name (assuming the name was susceptible of ownership).

The starting point for any discussion of property rights in bankruptcy is state law. Under *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), state law defines property interests, but federal bankruptcy law determines how property will be treated in a bankruptcy case, that is, what is property of the estate. *See also*, *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *In re Segerstrom*, 247 F.3d 118, 224 (5th Cir. 2001).

According to a leading commentator on Louisiana Law, "[p]roperty may be defined as an exclusive right to control an economic good, corporeal or incorporeal; it is the name of a concept that refers to the rights and obligations, privileges and restrictions that govern the relations of men with respect to things of value." Yiannopoulos, 2 La. Civ. L. Treatise §1 (4th ed. 2001). Professor Yiannopoulos concludes that *property* should be used only to designate the rights that persons have with respect to things. Louisiana Civil Code article 477 defines *ownership* as the "right that confers on a person direct, immediate and exclusive authority over a thing." La. Civ. Code art. 477(A).

Applying a similarly broad concept of *property* as defined by California law, the court in *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) concluded that the registrants of internet domain names have an intangible property right in the domain

12

name. The court found that a domain name is a defined interest, that the registrant of a domain name has an exclusive claim to the name and that the domain name has value and can be bought and sold. *Id*.

Therefore, if, as the defendants contend, the *smartdiscipline.com* domain name itself cannot be owned, nevertheless both a domain name and the contractual right to use that name are property rights under Louisiana law. Because the debtor's conveyance of the service mark *Smart Discipline* to McLear was not effective, the name and any rights to use it, whether in an internet domain name or otherwise, belonged to the debtor on the date of bankruptcy. Therefore, they are property of LKA's estate. 11 U.S.C. §541.

Accordingly, the Court will grant judgment in the trustee's favor declaring the domain name *smartdiscipline.com* property of the LKA bankruptcy estate.

### III. Count Three – Claims relating to Smart Family Press

Finally, the trustee alleges that the trade name *Smart Family Press* belongs to the LKA estate, and not to McLear.

Ms. McLear testified that she conceived of the name "Smart Family Press," and obtained a federal employee identification number. Exhibit D-1 (Notification from the Department of the Treasury of assignment of employer identification number to Andrea McLear for *Smart Family Press*). She never registered the trade name, never published a book and never had any revenues from the name. However, neither was there any evidence that LKA, Larry Koenig or Nydia Koenig ever owned or registered *Smart Family Press* as a trade name or trademark. Absent satisfactory proof as to *who* owns

13

*Smart Family Press*, the Court cannot find that the debtor and thus the estate have any interest in the name.[10]

## INTERVENOR'S CLAIMS

VFS intervened in the adversary proceeding to assert its claim to intangible rights, including copyrights, relating to numerous books, tapes, videos, pamphlets and other works allegedly created by Larry Koenig before he filed bankruptcy. VFS appears to seek a declaration that it is the owner of copyrights and intellectual property rights relating to materials it bought from the Koenigs' trustee in September 2002 with court approval.[11] VFS contends that it bought the intellectual property rights as part of its purchase of the tangible assets from the trustee.

VFS also demands that the Koenigs amend their bankruptcy schedules to include as assets certain copyrights and other intellectual property rights associated with books, manuals, audio and videotapes created by Larry Koenig and used in connection with his parenting seminar programs.

VFS is not entitled to an order compelling the debtors to amend their schedules. The debtors adequately disclosed their interest in the self-help manuals in response to item 21 on Schedule B filed November 5, 2001. They also scheduled their interests in the copyrights and other intellectual property incorporated into the manuals. At trial, the defendants stipulated that the works in question all were created by Larry Koenig personally. Larry Koenig testified that the eleven self-help "manuals" (comprising

---

[10] "Registration of a trademark is prima facie evidence of the registrant's ownership of the mark and of the registrant's exclusive right to use the mark . . . ." *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3,10 (5th Cir. 1974).

[11] Actually, in its Petition for Intervention at paragraph 14 VFS alleges that it purchased "various rights" from the bankruptcy estate of LKA. This is erroneous. VFS's purchase was from the estate of Larry and Nydia Koenig.

booklets, audio and video tapes) on his schedules are the same as those materials offered into evidence as Exhibits V-1 through V-35. No schedule amendments are necessary.

. The trustee's sale approved on September 10, 2002 included only certain tangible assets of the Koenig's estate. There is no evidence that VFS purchased any other assets. Moreover, this Court has never concluded that the copyrights and intellectual property rights listed by the Koenigs in their schedules were owned by anyone other than Larry Koenig. That property remains property of the estate because the Koenigs' bankruptcy case has not been closed. *See* 11 U.S.C. §554(c). The trustee will administer the assets as he would any other property of the estate.[12]

## CONCLUSION

The purported transfer of the service mark *Smart Discipline* from LKA to Andrea McLear is avoided pursuant to 11 U.S.C. §544(a) as a relative simulation or disguised donation under Louisiana law. Under 11 U.S.C. §541, *Smart Discipline* is property of the debtor's estate. The domain name *smartdiscipline.com* is also declared to be property of the debtor's estate. However, the Court concludes that the trademark/trade name *Smart Family Press* is not property of the estate of LKA. Finally, the Court denies all relief sought by the Intervenor, VFS, and will dismiss the Petition for Intervention.

Baton Rouge, Louisiana, March 31, 2004.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[12] Larry Koenig testified on examination counsel for VFS that sales of the copyrighted material post-bankruptcy produced "substantial revenues." This opinion does not address the trustee's remedies for the debtor's post-petition use of the intellectual property, which was not an issue in this adversary proceeding.